**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR-21-00852-001-TUC-SHR (EJM) |
| Plaintiff, | **REPORT AND RECOMMENDATION** |
| v. | |
| Kyrie Eliz Johnson, | |
| Defendant. | |

Pending before the Court is a Motion to Suppress Evidence Resulting from an Unlawful Stop filed by Defendant Kyrie Eliz Johnson ("Johnson"). (Doc. 43). The defendant argues that the Court should suppress all statements and evidence obtained from the illegal stop and subsequent arrest because the law enforcement officer did not have a reasonable suspicion that a crime occurred. Specifically, the officer had no objective, articulable, individualized facts to form a basis for particularized suspicion when he pulled the defendant over, but rather relied merely on a hunch that the defendant may have been involved in criminal activity. The defendant thus contends that because there was no reasonable suspicion for the stop, the exclusionary rule mandates that the Court suppress all evidence and statements that are the "fruits" of the defendant's illegal detention. Further, the defendant alleges that she was in police custody from the moment that the stop was made, but that the officer failed to give *Miranda* warnings until after he intentionally elicited incriminating information from her. Thus, the defendant's statements made in violation of *Miranda* are inadmissible and must be suppressed as fruit of the poisonous

tree—the defendant's unlawful stop.

The government argues that the law enforcement officer had the requisite reasonable suspicion to stop the defendant's car based on the totality of the circumstances and the officer's training and experience. Specifically, the government contends that the officer lawfully conducted a brief, investigatory stop based on a reasonable suspicion that the defendant was involved in criminal activity—suspected narcotics or alien smuggling. The government further argues that because the officer had reasonable suspicion to stop the defendant's car, any statements made prior to the defendant's arrest were in relation to the immigration inspection and thus the defendant was not in custody for purposes of *Miranda* such that her statements should be suppressed. Finally, the government contends that, following the immigration inspection, the officer properly *Mirandized* the defendant prior to her being in custody or interrogated and any statements made after that point were made with a valid waiver of her *Miranda* rights.

For the reasons stated below, the Court finds that the defendant's motion to suppress the evidence should be granted because the law enforcement officer lacked reasonable suspicion to stop the defendant's car. Based on the testimony presented at the suppression hearing and the parties' pleadings, the Court finds that the officer lacked specific and articulable facts to support an objective belief that the defendant was engaged in a specific criminal activity. And, because the stop was unlawful—and the defendant "seized" without reasonable suspicion or probable cause—any statements made, or evidence found, in conjunction with the illegal stop must be suppressed as fruits of the defendant's illegal detention. As such, the Court recommends that the District Court suppress all statements and evidence obtained from the illegal stop and the defendant's subsequent arrest.

## FACTUAL BACKGROUND

### 1. Procedural History

On April 28, 2021 a federal grand jury sitting in Tucson, Arizona returned an Indictment against Johnson charging her with three felony offenses relating to the transportation of illegal aliens. (Doc. 15). Count One charges Johnson with knowingly and

intentionally conspiring to transport illegal aliens for profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(v)(I), (a)(1)(A)(ii), and (a)(1)(B)(i). Counts Two and Three charge Johnson with knowingly and in reckless disregard of the fact that an alien was in the United States illegally, transporting the alien for profit, in violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (a)(1)(B)(i).

On March 8, 2022 the defendant filed a Motion to Suppress Evidence Resulting from an Unlawful Stop. As noted above, the defendant argues that all statements and evidence obtained from the stop of her vehicle and her subsequent arrest must be suppressed because the law enforcement officer lacked reasonable suspicion to effectuate the stop. As discussed more fully below, the defendant contends that the officer lacked any objective facts to support a reasonable suspicion that criminal activity was afoot, but rather was engaged in a fishing expedition to uncover evidence to justify the stop. The defendant asserts that because there was no reasonable suspicion for the stop, the stop itself and the subsequent encounter are unconstitutional and thus require the suppression of all evidence, statements, and information arising from this encounter.

The government argues that, based on the totality of the circumstances, including the officer's training and experience, his observations of the occupants of the vehicle, the behavior of the driver, the vehicle registration information, the characteristics of the area, the proximity to the border, and previous alien and drug smuggling activity in the area, the officer had a reasonable suspicion that the defendant's car was transporting aliens or narcotics. The government thus contends that the officer conducted a lawful roving patrol stop, or immigration stop, of the defendant's vehicle, supported by reasonable suspicion that the defendant was engaged in criminal activity. Moreover, because the stop was based on reasonable suspicion that individuals in the vehicle were illegal aliens, the officer's questions regarding the occupants' citizenship were made as part of an immigration inspection, which does not require *Miranda* warnings. After the officer conducted the immigration inspection, he *Mirandized* the defendant and any statements she made thereafter were made with a valid waiver of her *Miranda* rights. In sum, the government

submits that the officer made a brief traffic stop supported by reasonable suspicion, conducted an immigration inspection, and then *Mirandized* the defendant prior to her being in custody or interrogated, and therefore requests that the Court deny the defendant's motion to suppress evidence.

On April 12, 2021 the Court held an evidentiary hearing on the defendant's motion. United States Border Patrol Agent Alan Lopez testified as follows.

### 2. Agent Lopez's Testimony

#### a. Direct Examination

Agent Lopez testified that he was been employed at the Willcox Border Patrol Station in Willcox, Arizona for three and a half years. (4/12/22 Tr. at 4). He spent six months training at the United States Border Patrol Academy in New Mexico, where they covered immigration law, arrest techniques, scenarios on how to identify human smuggling, and real-world traffic stop scenarios. *Id.* at 5. The traffic stop scenarios were used to train agents on how to identify the tactics and techniques that smugglers use. *Id.* After he left the academy, Agent Lopez received an additional six months of on-the-job training where he worked with more experienced agents to conduct traffic stops and observe stops relating to human smuggling, and made arrests in those cases. *Id.* at 5–6. He received a lot of his information and experience about smuggling techniques by working with the more experienced agents. *Id.* at 10. He has been doing traffic stops in Wilcox for about two and a half years. *Id.* at 6.

Every day before work, the agents "muster." *Id.* at 9. They gather before their shift and talk with the supervisors and management to discuss the events of the day, and in particular any smuggling operations that they are aware of. *Id.* This includes "BOLOs" which is "be on the lookout" for particular vehicles, where they're coming from, the area they're coming from, and what routes they're planning to take. *Id.* The muster also includes what checkpoints are open or closed that day, and what checkpoint an agent is going to be assigned to that day. *Id.* at 9–10.

Agent Lopez was shown a map, which he described as the area of operation of the

Willcox Border Patrol Station and the roads the agents patrolled. *Id.* at 7. The area has three immigration checkpoints: one on Highway 90 just north of State Route 82, near Whetstone; one at the intersection of State Route 82 and State Route 80, near Tombstone; and one on 191. *Id.* at 8. The purpose of the checkpoints are for immigration inspection to ascertain the citizenship of everyone passing through the checkpoint, and the checkpoints are strategically located due to the proximity of the border area. *Id.* at 12. The checkpoints are mostly located on roads that run north to south because the border is to the south and smuggling operations use the highways to bring people and contraband into the United States to the Tucson and Phoenix areas. *Id.* Border Patrol makes apprehensions on a daily basis and seizes multiple vehicles a day. *Id.* Sometimes a checkpoint is closed due to weather or personnel/manpower issues. *Id.* at 13. If the checkpoint is closed, Agent Lopez's role switches from being at the checkpoint conducting immigration inspections to being on roving patrol duty where he observes traffic on the highway. *Id.* A roving patrol is an agent who is observing traffic looking for immigration violations. *Id.*

On January 16, 2021 Agent Lopez was assigned to the State Route 80 area. *Id.* at 14. The checkpoint was closed that day, so he was looking for traffic. *Id.* He got to the area a little after 3 p.m. and parked his vehicle basically right at the immigration checkpoint at State Route 80. *Id.* at 15. He was in a marked border patrol vehicle. *Id.* at 18. Around 5:30 p.m., he saw a gray 2020 Infiniti QX60 pass his location. *Id.* at 17. The Infiniti was traveling eastbound on Highway 82 and made a left turn northbound on Highway 80. *Id.* It was significant to him to know where the vehicle had come from because: "Well, at the time, I believe the Highway 90 checkpoint was open. So smugglers often take advantage of the immigration checkpoint closure on Highway 80 and use Highway 82 in order to circumvent the Highway 90 checkpoint." *Id.* When asked why he would think this, Agent Lopez answered, "Well, it's a common trend that smugglers use in itself, the vehicle traveling -- it's a common trend that smugglers use." *Id.* When asked whether State Route 80 would take longer than State Route 90 when traveling north to south, Agent Lopez explained:

- 5 -

> Yes. I mean, depends where you're coming from, but -- but the common trend is coming out of Sierra Vista, is where a lot of what we call stash houses are at, and they usually would run up Highway 90. But if Highway 90 checkpoint is open, and Highway 80 checkpoint is closed, the quickest route for them to get up north, up to I-10, would be to make a right eastbound on Highway 82 and then proceed north through Highway 80.

*Id.* at 17–18.

When the Infiniti passed Agent Lopez, he noticed the following:

> I observed two individuals, . . . female driving and a male in the passenger's seat. I observed that they were both wearing what appeared to be surgical mask. And I also noticed that the vehicle had, like, a screen on the back windows, like a privacy screen, and it had, I believe, tinted windows, and also that the vehicle appeared to be a rental vehicle.

*Id.* at 18. The driver and passenger were staring straight forward. *Id.* at 21. It was not suspicious to him to see a female and a male driving together. *Id.* at 18. The female appeared to be white or light-skinned and the male appeared to be Hispanic. *Id.* at 18–19. This was not suspicious to Agent Lopez when he was observing traffic. *Id.* at 19. When asked whether wearing surgical masks was suspicious, he answered, "Just depends on, like, on the circumstance." *Id.*[1] In this particular situation, it made him think that "the driver and the passenger were not of the same household or that they knew each other at all." *Id.* Tinted windows and screens were significant to him because it was "just another tactic that smugglers use. They'll typically put something over the windows to conceal the fact that there are more people in the back compartment seat." *Id.* When asked if he could tell how many passengers were in the car, Agent Lopez stated that he could only see the driver and front seat passenger at that time. *Id.* He noticed the car had an out-of-state license plate, and that led him to believe that it was a possible rental vehicle. *Id.* at 20. This was important to him "[b]ecause smugglers often use rental vehicles to facilitate their smuggling

---

[1] Earlier during direct examination, when Agent Lopez was asked whether coronavirus was circulating in Arizona during January 2021, he stated, "I believe so." *Id.* at 11. When asked whether he observed people wearing masks in their vehicles when he was observing traffic, Agent Lopez answered: "Not typically. The people that I would usually observe wearing masks were, like, maybe medical transports or maybe -- usually older people. But, typically, I wouldn't observe people in their vehicle wearing masks." *Id.* Agent Lopez agreed that most of the people he observed in vehicles in January 2021 were not wearing masks, and stated: "It was my observation that people from the same household would not typically wear masks while they were driving in the vehicle." *Id.*

operations of humans or contraband[,]" something he learned at the academy and in his personal experience while working at the Willcox Border Patrol Station. *Id.* Agent Lopez also noticed that the vehicle appeared to be "very clean" and this was important to him and added to his suspicion because people in that area tended to go off road so their vehicles were kind of dirty or had mud marks on the fender. *Id.*

After the Infiniti passed him, Agent Lopez pulled behind it and did a registration check, which came back to a rental vehicle. *Id.* at 21. The highway in that area had one lane going in each direction. *Id.* Agent Lopez pulled directly alongside the vehicle like he was going to pass it, but before he passed it, he wanted to look inside so he could observe the behavior of the occupants. *Id.* He could still only see the driver and the passenger due to the rear window screens. *Id.* While he drove alongside them for several seconds, neither the driver nor passenger looked over in his direction. *Id.* at 22. "[T]hey both seemed to be -- they looked, like, uncomfortable, or they looked kind of like -- just like a statue, just like staring forward, like they would not acknowledge me being alongside of them." *Id.* When asked what typically happens when he pulls up next to someone, Agent Lopez stated:

> Especially on a road like this that's only one way, when you pass somebody on one of these roads, they'll typically at least look over and see who's passing them. In this particular situation, I kind of stayed there for several seconds more, just to see if they would look over. Typically, in my training and experience, when you pass somebody on a highway, especially like that, if you're right alongside of them, they're going to look. They're going to say, what's going on?

*Id.* After Agent Lopez observed the Infiniti for several seconds, he passed the car and sped up a little bit and pulled over to the side of the road. *Id.* He did this "[b]ecause I was going to let them pass me again so I could conduct a vehicle stop, a roving patrol stop." *Id.* at 23. He called into the radio that he was making a single-agent vehicle stop. *Id.* at 23. He did not specifically request backup, but another agent got on the radio and said he was just a few minutes out. *Id.*

Agent Lopez activated his lights and siren and pulled the Infiniti over without incident. *Id.* at 23. He approached the vehicle from the passenger side and asked the driver to lower all of the windows because he couldn't see anything in the back seat. *Id.* He asked

- 7 -

1   the driver something along the lines of where she was coming from, and she told him she

2   was coming from Sierra Vista and heading to Phoenix. *Id.* at 24. When questioned whether

3   he asked the driver for her keys, Agent Lopez stated:

4        I did. . . . because when I asked her to lower the windows, she
         did, and then I observed the two other individuals, which were
5        also wearing masks in the back seat. After observing their
         demeanor and asking her a couple of questions, for my safety,
6        in order for me to continue conducting my immigration
         inspection, I asked her to turn off the vehicle and to give me
7        the keys.

8   *Id.* When asked whether he collected identification from anyone in the car, Agent Lopez

9   answered, "Yes. That's when I proceeded to conduct an immigration inspection on all the

10  occupants, and I determined that they were all unlawfully present in the United States." *Id.*

11  There were four occupants including the driver. *Id.* He conducted an immigration

12  inspection on everyone and determined that the three male subjects were present in the

13  United States illegally. *Id.* By that time, backup had arrived, and Agent Lopez took the

14  defendant into custody. *Id.* at 25. He did not *Mirandize* her at that point. He "first took her

15  into custody, placed her in my patrol vehicle, and then proceeded to help my partner with

16  placing the other subjects into custody and securing them." *Id.* When asked why he waited

17  to *Mirandize* the defendant, Agent Lopez answered: "Just because I wasn't asking her any

18  questions at that time, any incriminating questions, and also just so we could just get the

19  whole situation safe, secure the subjects that were in the vehicle, and also to have a witness

20  when I *Mirandized* her." *Id.*

21                **b.  Cross-Examination**

22         Agent Lopez confirmed that he had two and a half years experience in the field,

23  "more or less." *Id.* at 25. During that time, he was responsible for stopping and arresting

24  approximately 10 alien smugglers. *Id.* at 25–26. He agreed with defense counsel that when

25  he decided to pull the Infiniti over, the evidence that he had was that the vehicle was clean,

26  the checkpoint was closed, the people wouldn't look at him when he passed them, it was a

27  rental vehicle, and the people were wearing surgical masks. *Id.* at 26.

28         When asked whether he had any information that the defendant knew the checkpoint

- 8 -

was down, Agent Lopez responded, "of course I didn't know what was going on in Ms. Johnson's head." *Id.* at 26–27. He did not see cars traveling in tandem and one turning around to warn the other that the checkpoint was closed or open. *Id.* at 27. He was not aware of another vehicle traveling with the Infiniti at all. *Id.* He did not recall if, even now, he had any information that the defendant was texting or calling with anyone who was scouting the location or the checkpoint. *Id.* When asked whether he would have put it in his report if he had found some evidence that the defendant was talking to people about the checkpoint, Agent Lopez stated, "I didn't put that in my report." *Id.* When defense counsel stated, "Because it didn't happen, correct?" Agent Lopez answered, "I'm not sure it happened or not." *Id.* When asked again whether he had information that someone scouted the checkpoint for the defendant, Agent Lopez answered, "No." *Id.* at 28.

Agent Lopez saw a clean SUV and stated in his report that smugglers often use rental cars. *Id.* at 28. He agreed with defense counsel that regular people use rental cars, that smugglers also use old cars, and that smugglers sometimes use newer cars. *Id.* When defense counsel stated that there was nothing about the rental that tied it specifically to smuggling, Agent Lopez said, "Not in itself, but I use it as one of the articulable facts in my -- [report]." *Id.* He called in the plate and found out it was a rental car but did not know who rented it and when. *Id.* at 29.

Agent Lopez confirmed that he did not put any traffic violations in his report and stated, "No. We don't do traffic violations." *Id.* at 29. He agreed that if had noticed a traffic violation like weaving in the lane or speeding, he would have put it in his report, and if it wasn't in there, it's probably because he didn't see any violations. *Id.*

Agent Lopez stated that in his experience, people who know each other or family members don't wear masks in cars. *Id.* at 30. When asked why this was important as to smuggling, or why people had to have a family member or friend with them when they travel, he answered: "Well, it's part of my observation that I have been observing, and it's one of the articulable facts that I used to develop my reasonable suspicion." *Id.* He didn't recall what exact word he used in his report but agreed that he thought it was odd that the

people were wearing surgical masks. *Id.* When asked whether he knew there was a national mask mandate in place on January 16, 2021 for public places, Agent Lopez stated, "I believe there might have been one here in Arizona, but I don't believe it was for driving in a vehicle with your family." *Id.* at 31–32. He believed that at that time, agents had to wear masks inside the Willcox Border Patrol Station. *Id.* at 33.

Defense counsel noted that in his report, Agent Lopez stated: "It is common practice for smugglers to use rental vehicles in order to blend in with traffic and also to disguise themselves as possible tourists." *Id.* at 30. Defense counsel asked how Agent Lopez could tell what the people were wearing or that they were pretending to be tourists by driving by and seeing them wearing masks, and Agent Lopez explained: "Well, I think what I was trying to state there is that they will use rental vehicles sometimes just to kind of -- like they get a clean rental vehicle so they can kind of blend in, or something like that, with tourists." *Id.* at 31. Agent Lopez agreed that sometimes smugglers don't use clean rental vehicles, they use dirty old vehicles. *Id.* As to whether a clean rental vehicle indicates smuggling to him, it's more that it's a rental vehicle, the clean part was just an extra observation. *Id.*

Agent Lopez stated that he found it odd, in his experience, that when he passed the vehicle, the occupants didn't look at him. *Id.* at 32. When asked whether he's had people he passes look at him and not look at him, Agent Lopez answered: "In my training and experience, when you pass a vehicle, typically the occupants of that vehicle will look over to see who is [in] the vehicle that's passing them." *Id.* In the approximately ten cases that he's arrested smugglers, "the vast majority, if not all," the people were not looking at him. *Id.* at 33. He couldn't recall a specific case name but was "pretty certain" that he had mentioned in previous reports whether a suspect looked at him or not. *Id.*

Agent Lopez admitted that when he saw the Infiniti, he didn't know where the car was coming from; he just guessed Sierra Vista because Route 80 is a main connecting road. *Id.* at 34.

. . .

### c. Redirect Examination

Agent Lopez testified that using rental vehicles was a trend he had learned about in his training at the academy and in his training and experience in the field. *Id.* at 35. He learned that "smuggling organizations would use rental vehicles, and sometimes they'd use bigger vehicles, SUVs. Just depends on how many people they were trying to attempt to smuggle. They would commonly use rental vehicles." *Id.*

He had also learned, in his training and experience, that:

> [S]muggling organizations don't even need to send a, quote-unquote, "scout vehicle" in order to see if the checkpoints are closed. Right now, that information can be found on Google Maps. They observe the traffic, the flow of traffic on Google Maps, and they can see if traffic is coming to a stop at the -- I mean, it's very detailed. It will tell you this is the immigration checkpoint, and you would see the red bars, indicating that traffic is coming to a halt at that particular area. So it's come to my attention that these are the tactics that they use. They don't even need to send a scout vehicle.

*Id.* at 35–36.

When asked whether, from where he was situated at the checkpoint, he wouldn't have certain information about where a vehicle was coming from but would be able to tell the direction they were coming from when he saw them, Agent Lopez explained:

> Right. I mean, I was sitting right there at the immigration checkpoint for a reason, . . . at the Highway 80 immigration checkpoint. Knowing that the Highway 90 immigration checkpoint was closed, it was a big trend for smugglers to detour and use Highway 82 to get to Highway 80 in order to circumvent the Highway 90 checkpoint, which is open, knowing that the Highway 80 checkpoint was closed. That was a common route that they would take. That was why I was specifically parked in that location, so I can observe the traffic coming in and out of that intersection, specifically the traffic that was turning north, northbound.

*Id.* at 36. In this particular case, he knew that the Infiniti came from the west. *Id.* at 36–37.

### d. By the Court

Agent Lopez confirmed that he was positioned by the checkpoint on Route 80, which was closed that day, and that the checkpoint on Route 90 was open. *Id.* at 37. He affirmed that if the defendant had taken a left onto Route 90, she would have been inspected there. *Id.* He explained that:

1
2
3
4
5
6

> Highway 82 connects Highway 90 to Highway 80. And when the Highway 90 checkpoint is open, meaning that they are conducting immigration inspections at that checkpoint, they commonly would detour and take Highway 82 eastbound in order to -- knowing that the Highway 80 checkpoint is not up and running, that there's no inspections being conducted there, they would use Highway 82 to get to Highway 80 in order to get back up to I-10. So, basically, they're just circumventing Highway 90. It may take them a little while longer, but that's the way that they'll circumvent the Highway 90 checkpoint in order to get up to I-10. And then their destination is either usually Tucson or Phoenix.

7

*Id.* at 37–38.

8
9
10
11
12
13
14
15

Regarding the window screens that Agent Lopez observed, the Court asked whether these were the types of screens that you pull up or stick on with suction cups and people use to shade kids in the backseat of the car. *Id.* at 38. Agent Lopez stated that he believed the vehicle was fairly new, like a luxury style vehicle, and he believed those vehicles have ones where you press a button and the screen just goes up alongside the window. *Id.* He agreed with the Court that when you get a rental vehicle, you take what you get, and that unless you specifically ask for tint and screens, you just take the car that they give you. *Id.* at 38–39.

16
17

When asked whether agents take the driver's keys for all traffic stops, Agent Lopez responded:

18
19
20
21
22

> At the time that I did it, I basically was absolutely -- in my mind at the time, I was sure that this was a smuggling event, based on all the information that I had, all my articulable facts that I had to make the stop. And then also -- so when I actually saw the occupants and I observed their demeanor and I asked a few questions, I, basically in my mind at that point, was pretty much sure that it was a smuggling event. If not, I wouldn't have asked for the keys.

23
24
25
26
27
28

*Id.* at 39. After he approached the car, he asked the driver to lower all the windows and observed the occupants. *Id.* He asked the driver where she was coming from and she responded. *Id.* Then, based on those observations and the demeanor of the occupants, he was "pretty sure it was a smuggling event, so I just asked her for the keys, for everyone's safety." *Id.* Agent Lopez believed the driver said she was coming from Sierra Vista and headed to Phoenix, then stated "[a]nd that's not the route to Phoenix coming from Sierra

1    Vista." *Id.* at 40.

2        Agent Lopez agreed that it was fair to say that this area of southern Arizona has a

3    lot of touristy spots and he does see rental vehicles that he doesn't end up stopping. *Id.* at

4    40. The Court noted that there were old "beater" vehicles transporting people and asked

5    whether he had stopped these cars and found people transporting undocumented people.

6    *Id.* Agent Lopez stated, "I have, but increasingly I believe the techniques that they're using

7    are moving away from those type of vehicles. I'm not going to say that it doesn't happen,

8    but they're increasingly becoming more sophisticated on how they smuggle." *Id.*

9        Lastly, the Court asked Agent Lopez to explain what he meant by "roving patrol

10   stop." *Id.* at 40. He answered:

11           I believe it's just what it -- how they describe the stops that
     we're doing, how they're described in case law, things of that
12           nature. That's what we're told to say. That's what it is, a roving
     patrol stop. We're border patrol agents that are in a vehicle and
13           we're patrolling, so they call it roving patrol.

14   *Id.* at 40–41.

15                          **DISCUSSION**

16       **1.  Legal Standard**

17       "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the

18   Government, and its protections extend to brief investigatory stops of persons or vehicles

19   that fall short of traditional arrest." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing

20   *Terry v. Ohio*, 392 U.S. 1, 9 (1968) and *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

21   "Whenever a police officer accosts an individual and restrains his freedom to walk away,

22   he has 'seized' that person, and the Fourth Amendment requires that the seizure be

23   reasonable." *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1975) (internal

24   quotations and citation omitted). Border Patrol agents may perform "brief investigatory

25   stops" only if they have a "reasonable suspicion to believe that criminal activity may be

26   afoot." *United States v. Raygoza-Garcia*, 902 F.3d 994, 999 (9th Cir. 2018); *see also*

27   *Cortez*, 449 U.S. at 417 ("An investigatory stop must be justified by some objective

28   manifestation that the person stopped is, or is about to be, engaged in criminal activity.");

*Brignoni-Ponce*, 422 U.S. at 884 ("officers on roving patrol may stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion that the vehicles contain aliens who may be illegally in the country"); *United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) ("Officers on roving border patrols . . . may conduct 'brief investigatory stops' without violating the Fourth Amendment 'if the officer's action is supported by reasonable suspicion to believe that criminal activity may be afoot.'" (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002))).

"Reasonable suspicion requires specific, articulable facts which, together with objective and reasonable inferences, form a basis for suspecting that a particular person is engaged in criminal conduct." *United States v. Thomas*, 211 F.3d 1186, 1189 (9th Cir. 2000) (internal quotations and citation omitted); *see also Valdes-Vega*, 738 F.3d at 1078 (reasonable suspicion is "a particularized and objective basis for suspecting the particular person stopped of criminal activity" (internal quotations and citations omitted)). This "requirement of *particularized* suspicion encompasses two elements. First, the assessment must be based upon the totality of the circumstances. Second, that assessment must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000).

The reasonable suspicion standard "is not a particularly high threshold to reach[,]" *Valdes-Vega*, 738 F.3d at 1078, and "the level of suspicion required for a *Terry* stop is obviously less demanding than that for probable cause." *United States v. Sokolow*, 490 U.S. 1, 8 (1989). However, "a mere hunch is insufficient to justify a stop," *Valdes-Vega*, 738 F.3d at 1078 (quoting *Arvizu*, 534 U.S. at 274), and an investigatory stop must be based on objective facts and not the "mere subjective impressions of a particular officer." *United States v. Hernandez-Alvarado*, 891 F.2d 1414, 1416 (9th Cir. 1989); *see also Nicacio v. U.S. I.N.S.*, 797 F.2d 700, 702–03 (9th Cir. 1985) ("the articulable facts forming the basis of a reasonable suspicion are measured against an objective reasonable man standard, not

by the subjective impressions of a particular officer" (internal quotations and citation omitted)), *overruled in part on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1045 (9th Cir. 1999).

When making a reasonable-suspicion determination, the reviewing court "must look at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 499 U.S. at 417–18); *see also United States. v. Alvarez*, 899 F.2d 833, 836 (9th Cir. 1990). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Id.* (quoting *Cortez*, 499 U.S. at 418). Moreover, what may seem to be innocuous conduct when viewed in isolation may be appropriately considered when considering the totality of the circumstances; thus, it is inappropriate to view factors in isolation and to give no weight to factors which may have an innocent explanation. *Id.* at 274 (*Terry* precludes a "divide-and-conquer analysis"); *see also United States v. Cotterman*, 709 F.3d 952, 970 (9th Cir. 2013) ("It is not our province to nitpick the factors in isolation but instead to view them in the totality of the circumstances."). The court may conclude that "some factors [in a particular case] are more probative than others," but cannot presumptively conclude that certain factors have no weight, because each case must turn on the totality of the circumstances of that particular situation. *Valdes-Vega*, 738 F.3d at 1079 (internal quotations and citations omitted) (alteration in original). Furthermore, "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277.

> The idea that an assessment of the whole picture must yield a particularized suspicion contains two elements, each of which must be present before a stop is permissible. First, the assessment must be based upon all the circumstances. The analysis proceeds with various objective observations, information from police reports, if such are available, and consideration of the modes or patterns of operation of certain kinds of lawbreakers. From these data, a trained officer draws inferences and makes deductions—inferences and deductions that might well elude an untrained person.
>
> . . .

> The second element contained in the idea that an assessment of the whole picture must yield a particularized suspicion is the concept that the process just described must raise a suspicion that the particular individual being stopped is engaged in wrongdoing.

*Cortez*, 449 U.S. at 418.

When a stop is unlawful, the exclusionary rule provides that "evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974); *see also Mapp v. Ohio*, 367 U.S. 643, 655 (1961) (holding that "all evidence obtained by searches and seizures in violation of the Constitution is, by that same authority, inadmissible in a state court"). "This prohibition applies as well to the fruits of the illegally seized evidence." *Id.*

### 2. Totality of the Circumstances

In the context of stops made near a border, the Supreme Court has identified a non-exclusive set of factors that may be considered in determining whether reasonable suspicion exists: (1) characteristics of the area in which the car is traveling; (2) proximity to the border; (3) usual traffic patterns on the road; (4) prior experience with alien traffic; (5) recent illegal border crossings in the area; (6) erratic or evasive driving behavior; (7) vehicle characteristics; and (8) the behavior or appearance of persons in the car. *Brignoni-Ponce*, 422 U.S. at 884–85. "Not all of these factors must be present or highly probative in every case to justify reasonable suspicion[, a]nd the facts must be filtered through the lens of the agents' training and experience." *Valdes-Vega*, 738 F.3d at 1079.

### a. Characteristics of the area and proximity to the border

Here, Agent Lopez testified about the general area of the Willcox Border Patrol Station as containing three immigration checkpoints. He explained that the checkpoints are strategically located due to their proximity to the border area and the pattern of smuggling traffic running south from the border north to Phoenix and Tucson. But he admitted that Southern Arizona is a popular destination for tourists.

. . .

### b.  Usual traffic patterns and prior experience with alien traffic

Agent Lopez testified as to routes smugglers used to evade checkpoints. Specifically, if the Highway 90 checkpoint was open, and the Highway 80 checkpoint was closed, smugglers would often take advantage of this by traveling eastbound on Highway 82 and turning north on Highway 80 to bypass the Highway 90 checkpoint to get to Interstate 10. He stated that this was the trend was for smugglers coming from Sierra Vista. Agent Lopez further stated that it would depend on where you're coming from, but generally it would take longer to use Highway 80 than Highway 90 to get to I-10. But he admitted that he did not know if the defendant had driven by the intersection of Highway 82 and Highway 90 where the checkpoint is located, let alone if she knew that checkpoint was open.

### c.  Recent illegal border crossings in the area

Agent Lopez did not give any specific testimony about recent illegal border crossings. He testified generally about the trend of smugglers using Highway 80 to bypass Highway 90, and the trend of smugglers using newer rental vehicles versus older, beat-up vehicles.

### d.  Erratic or evasive driving behavior

Agent Lopez did not testify that the Infiniti exhibited any erratic or evasive driving behaviors, and stated that if he had observed any traffic violations, he likely would have included that in his report. While Agent Lopez testified generally about smugglers scouting checkpoints, he admitted that he had no information that anyone had scouted the checkpoint for the defendant, or that she had called or texted anyone to scout the location. Agent Lopez further testified that he was not aware of any other vehicles traveling with the Infiniti and did not see cars traveling in tandem and one turning around to warn the other. Although Agent Lopez explained that he had learned in his training and experience that smugglers don't even need to send a scout vehicle because they are able to determine whether a checkpoint is open or closed by looking at Google Maps, it is pure speculation as to whether that occurred in this case and adds nothing to the reasonable suspicion

analysis to support a belief that this particular defendant was engaged in criminal activity.

### e. Vehicle characteristics

Agent Lopez testified that the vehicle stood out to him as a possible rental vehicle because it had an out of state plate, and that this was significant to him because in his training and experience, smugglers often use rental cars. He further stated that sometimes smugglers will use clean rental vehicles to blend in with tourists. When questioned by defense counsel, Agent Lopez agreed that regular people also use rental cars, and that sometimes smugglers used old cars, and sometimes they used newer cars. When defense counsel stated that there was nothing about the rental that tied it specifically to smuggling, Agent Lopez admitted "[n]ot in itself," but stated that he used this factor as one of the articulable facts in his report. (4/12/22 Tr. at 28). When questioned by the Court, Agent Lopez agreed that this area of southern Arizona has a lot of touristy spots and that he saw other rental vehicles on the road that he didn't stop. *Id.* at 40.

Agent Lopez testified that when the Infiniti passed him, it appeared to have tinted windows and privacy screens on the back windows. This was significant to him as "just another tactic that smugglers use" because they would "typically put something over the windows to conceal the fact that there are more people in the back compartment seat." (4/12/22 Tr. at 19). When questioned by the Court, he agreed that when you get a rental vehicle, unless you specifically request tinted windows and screens, you just take the car that you are given. *Id.* at 38–39. The Court finds that this factor has little probative value. It is hardly uncommon for vehicles in general, and particularly in southern Arizona, to have tinted windows or window screens.

Agent Lopez also testified that the Infiniti appeared very clean, which added to his suspicion because people living in that area tended to go off-road so their vehicles would be dirty or have mud marks on the fender. The Court finds that this factor has little probative value. Agent Lopez suspected and then confirmed with a license plate check that the Infiniti was a rental vehicle, and thus it presumably did not belong to someone living in the area and as such would not be dirty.

### f.   Behavior or appearance of persons in the car

Agent Lopez testified that he saw a white or light-skinned female driving with a male passenger in the front seat who appeared to be Hispanic. He did not think it was odd to see a man and woman driving together, or to see individuals of different races driving together. The Court agrees that the occupants' race and gender have no value in the reasonable suspicion analysis.

Agent Lopez observed that the driver and passenger were wearing surgical masks, and he found this suspicious under the circumstances because in this particular situation, it made him think that "the driver and the passenger were not of the same household or that they [didn't know] each other at all." (4/12/22 Tr. at 19). Agent Lopez testified that while he believed Coronavirus was circulating in Arizona at this time and that there was a mask mandate in effect for people in public places, he did not typically see people wearing masks when he was observing traffic, and typically did not see people of the same household wearing masks while driving. Usually if he did see people wearing masks, they were older people or people in a medical transport. The Court submits that this factor adds little to the reasonable suspicion analysis when, at the time of the incident, the nation was almost one year into a global pandemic with a mask mandate in effect, and Agent Lopez had no idea whether the people in the Infiniti were from the same household or not or were otherwise wearing masks due to a compromised immune system or recent travel, or perhaps simply because they felt safer.

Agent Lopez further thought that it was weird that the driver and front seat passenger didn't look over when he pulled alongside them for a few seconds, stating that they looked "uncomfortable . . . just like a statue, just like staring forward, like they would not acknowledge me being alongside of them." (4/12/22 Tr. at 22). He testified that typically when he passes someone, especially on a one-way road, the vehicle occupants would typically look over to see who was passing them. Agent Lopez further stated that in the approximately ten cases where he has arrested smugglers, "the vast majority, if not all," of the people did not look at him. *Id.* at 33. "Eye contact or lack thereof may be considered as

a factor contributing to reasonable suspicion." *United States v. Santos-Granados*, 2008 WL 401378, at *7 (D. Ariz. Feb. 12, 2008). "However, whether eye contact is suspicious or not is highly subjective and can devolve into a case of 'damned if you do, equally damned if you don't.'" *Id.* (quoting *Montero-Camargo*, 208 F.3d at 1136); *see also Nicacio*, 797 F.2d at 704 (collecting cases) ("lack of eye contact is not an appropriate factor to consider because it is not indicative of illegal alienage . . . [however,] special circumstances may make innocent avoidance of eye contact improbable and thus a factor contributing to a reasonable suspicion" in some situations (citations omitted)).

### 3.  No Particularized Suspicion

While the Court may not consider factors in isolation from one another or give no weight to factors that may have an innocent explanation, here, considering the totality of the circumstances, and taking into account Agent Lopez's training and experience, the Court finds that there was no reasonable, particularized suspicion to suspect the defendant of criminal wrongdoing. Agent Lopez was unable to identify any specific, objective facts to support a reasonable suspicion that this particular individual, as opposed to any other individual driving a newer, clean rental car on the highway while wearing a mask, was engaged in criminal activity. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 569 (1976) (Brennan, J., dissenting) ("Conduct, to be reasonable, must pass muster under objective standards applied to specific facts."); *see also Montero-Camargo*, 208 F.3d at 1130 ("innocuous conduct does *not* justify an investigatory stop unless there is other information or surrounding circumstances of which the police are aware, which, when considered along with the otherwise innocuous conduct, tend to indicate criminal activity has occurred or is about to take place"); *Nicacio*, 797 F.2d at 705 ("An agent's experience might make a situation suspicious to him which to the untrained or inexperienced eye would pass unnoticed or seem innocent. Such permissible deductions, or rational inferences, must, however, flow from objective facts and be capable of rational explanation." (internal quotations and citations omitted)); *Santos-Granados*, 2008 WL 401378 at *5 ("Reasonable suspicion cannot rely solely on generalizations that, if accepted,

casts suspicion on large segments or entire categories of the law abiding population.").[2]

Several of the factors that Agent Lopez cited as part of the circumstances he found suspicious go equally to criminal activity and noncriminal tourism. Likewise, much of his testimony as to the factors he found suspicious related to smuggling in general. But something more is required to support an objective reasonable suspicion to stop a particular vehicle. As the Supreme Court has noted, "[r]oads near the border carry not only aliens seeking to enter the country illegally, but a large volume of legitimate traffic as well." *Brignoni-Ponce*, 422 U.S. at 882. Thus, "[t]o approve roving-patrol stops of all vehicles in

---

[2] In upholding the district court's decision granting the defendant's motion to suppress in *United States v. Carrizoza-Gaxiola*, the Ninth Circuit noted the following:

> The facts known to the officers were: (1) a man appearing to be Mexican (2) was driving towards Nogales on a highway from Tucson (3) in a new appearing late-model Ford LTD (4) with Sonora, Mexico license plates; in addition, (5) each week some, but less than 30, late-model Ford LTD's are stolen in the Tucson and Phoenix areas and remained unrecovered, and (6) some of those cars turn up in Mexico.

523 F.2d 239, 241 (9th Cir. 1975). The court reasoned that:

> Although this information provides grounds for believing that some of the late-model Ford LTD's traveling towards Nogales on Interstate 19 are stolen, it does not provide any means for determining which ones. Founded suspicion requires some reasonable ground for singling out the person stopped as one who was involved or is about to be involved in criminal activity. Driving a car as common as a Ford LTD is not suspicious nor is driving it towards Nogales. That the driver appeared to be Mexican and that the car had Mexican license plates add nothing beyond residence in the country to which some stolen vehicles have been transported. Mexicans commonly drive into this country and then, not surprisingly, drive back.

*Id.* (citations omitted); *contra United States v. Palos-Marquez*, 591 F.3d 1272, 1278 (9th Cir. 2010) (finding reasonable suspicion for stop based on in-person tip, agents' knowledge that area was notorious for alien smuggling, vehicle's erratic driving, and agents' observation that vehicle occupants were visibly nervous); *United States v. Durazo*, 727 F. App'x 916, 917–18 (9th Cir. 2018) (finding reasonable suspicion where, among other things, defendant was driving along known smuggling route while the BPA checkpoint was closed, defendant had a TECS alert on him due to an alien smuggling arrest three months prior, and vehicle appeared to be driving in tandem with another vehicle also with a TECS alert); *Valdes-Vega*, 738 F.3d at 1079–80 (finding reasonable suspicion for stop where agents observed truck with foreign plates driving erratically in an area frequented by smugglers, and noting defendant's driving was "perhaps one of the most important factors in the total circumstances here" and was what separated defendant's truck from other cars in traffic that day and defendant from the population at large).

the border area, without any suspicion that a particular vehicle is carrying illegal immigrants, would subject the residents of these and other areas to potentially unlimited interference with their use of the highways, solely at the discretion of Border Patrol officers." *Id.* While "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation[,]" here, "[the defendant's] presence in a high crime area is *not* enough to support reasonable, particularized suspicion that the [defendant] . . . committed or [wa]s about to commit a crime." *Montero-Camargo*, 208 F.3d at 1138 (citation omitted); *see also Nicacio*, 797 F.2d at 703 ("*Brignoni-Ponce* and its progeny make clear that Hispanic-looking appearance and presence in an area where illegal aliens frequently travel are not enough to justify a stop to interrogate the occupants of a vehicle. More is required.").

While the Court recognizes that factors that may have an innocent explanation do not necessitate a finding that reasonable suspicion is lacking, here, the totality simply does not support an objective reasonably belief that the defendant was engaged in criminal behavior and as such there was no particularized suspicion to stop the defendant's vehicle. *See Montero-Camargo*, 208 F.3d at 1129 ("the officer in question must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity" (internal quotations and citation omitted)); *see also Thomas*, 211 F.3d at 1192 ("A hunch may provide the basis for solid police work; it may trigger an investigation that uncovers facts that establish reasonable suspicion, probable cause, or even grounds for a conviction. A hunch, however, is not a substitute for the necessary specific, articulable facts required to justify a Fourth Amendment intrusion.").

## 4. Conclusion

In sum, while the Court finds Agent Lopez's testimony credible, based upon the totality of the circumstances, the Court concludes that there was no reasonable suspicion for him to stop the defendant.  An individual driving a clean, newer model, rental car, on an area of the highway that is both close to the border and frequently traveled by locals and tourists, while wearing a mask during the height of a global pandemic, who fails to look

over at an officer that pulls alongside her for a few seconds before passing her, is not sufficiently unusual to warrant a stop. Thus, for the reasons stated above, the otherwise innocuous factors of type of vehicle, observation of vehicle and occupants while passing for a few seconds, and license plate check, when considered in the aggregate with the factors of proximity to the border, usual traffic patterns, and the agent's prior experience with alien traffic, do not suffice to form a particularized and objective basis that the defendant was about to commit or had committed a crime. Accordingly, because there was no reasonable suspicion for the stop, suppression of the defendant's statements and evidence seized is required.

### RECOMMENDATION

For the reasons stated above, the Court recommends that that District Court grant the defendant's motion and order that the defendant's statements and evidence seized pursuant to the unlawful stop be suppressed.

Pursuant to Federal Rule of Criminal Procedure 59(b)(2), any party may serve and file written objections within 14 days of being served with a copy of this Report and Recommendation. A party may respond to the other party's objections within fourteen days. No reply brief shall be filed on objections unless leave is granted by the district court. If any objections are filed, this action should be designated case number: **CR 21-00852-TUC-SHR**. Failure to timely file objections to any factual or legal determination of the Magistrate Judge may be considered a waiver of a party's right to de novo consideration of the issues. *See United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Dated this 20th day of April, 2022.

Eric J. Markovich
United States Magistrate Judge